PILLSBURY WINTHROP SHAW PITTMAN LLP
RONALD E. VAN BUSKIRK (SBN 64683)
ronald.vanbuskirk@pillsburylaw.com
MARGARET ROSEGAY (SBN 96963)
margaret.rosegay@pillsburylaw.com
STACEY C. WRIGHT (SBN 233414)
stacey.wright@pillsburylaw.com
Four Embarcadero Center, 22nd Floor
Post Office Box 2824
San Francisco, CA  94126-2824
Telephone: (415) 983-1000
Facsimile: (415) 983-1200

Attorneys for Plaintiff,
PHILLIPS 66 COMPANY

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PHILLIPS 66 COMPANY,<br><br>          Plaintiff,<br><br>     v.<br><br>CITY OF RICHMOND; CITY COUNCIL OF THE CITY OF RICHMOND,<br><br>          Defendants. | Case No.<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF<br><br>[VIOLATION OF THE COMMERCE CLAUSE; UNCONSTITUTIONAL IMPAIRMENT OF CONTRACTS] |

Plaintiff, Phillips 66 Company ("Phillips 66"), complains against Defendants, the City of Richmond ("City") and the City Council of the City of Richmond ("City Council") (collectively, "Defendants"), and for its complaint alleges as follows:

### NATURE OF THE ACTION

1.     Phillips 66 brings this action to invalidate a municipal ordinance adopted by Defendants that prohibits marine access to ship petroleum coke ("petcoke") and coal to

- 1 -

4849-2758-6486.v1

1    foreign markets from the Levin-Richmond Terminal (the "Terminal") located in Richmond,

2    California.  Phillips 66 produces petcoke at its petroleum refinery in Rodeo, California, and

3    exports it through the Terminal to overseas customers.  Despite decades of petcoke

4    exportation through the Terminal, Defendants enacted an ordinance on February 4, 2020,

5    (the "Ordinance") that completely prohibits the transloading of petcoke from trucks to ships

6    by banning any storage and handling of petcoke at the Terminal.  The Terminal is the sole

7    marine terminal available in Richmond and the immediate area for transshipment of

8    petcoke to interstate and overseas customers.

9         2.    Phillips 66 has produced petcoke at its Rodeo Refinery and shipped petcoke

10   to overseas customers from the Terminal for more than twenty years.  Petcoke is a valuable

11   product of the petroleum refining process and a critical component in numerous industrial

12   applications, both domestically and abroad.  Petcoke shipped through the Terminal is

13   exported for use in the manufacture of a wide variety of products, including medical

14   devices, aluminum, and titanium dioxide, which is used as a pigment for paint, plastics,

15   sunscreen, cosmetics, and food coloring.  As part of a political agenda to ban coal exports

16   through the Terminal (which began approximately six years ago to meet increasing

17   worldwide demand for cleaner-burning coal mined in the United States), Defendants

18   enacted the Ordinance to terminate all coal transshipments, and included within it a ban on

19   storage and handling of petcoke at the Terminal as well.

20        3.    For the reasons alleged herein, the Ordinance imposes an unreasonable

21   burden on interstate and foreign commerce that is unjustified and excessive in relation to

22   putative local benefits.  Among other things, Defendants banned petcoke "storage" and

23   "handling" in Richmond without any credible scientific evidence (i) that the Terminal or

24   petcoke are a source of harmful fugitive dust emissions in Richmond or (ii) that petcoke

25   presents any public health hazard.  To the contrary, overwhelming evidence before the City

26   Council demonstrated that petcoke handling and storage at the Terminal are not a source of

27   fugitive dust emissions and do not present any health risks.  While the Ordinance ostensibly

28

- 2 -

4849-2758-6486.v1

1    affords the Terminal a 3-year phase-out period to cease transshipment operations, in effect,

2    the Ordinance poses an immediate and direct threat to continued operation for

3    transshipment of petcoke.  Phillips 66 therefore seeks declaratory and injunctive relief

4    holding that the Ordinance is invalid and unenforceable under the Commerce Clause of the

5    U.S. Constitution, Article I, § 8, cl. 3 ("Commerce Clause").

6        4.    Respondents' action also violated the federal constitutional prohibition

7    against laws impairing the obligation of contracts.  U.S. Const., Art. 1, § 10 ("Impairments

8    Clause").  Among other things, the Ordinance substantially impairs Phillips 66's contracts

9    for petcoke transloading at the Terminal, as well as its contracts with purchasers of petcoke,

10   without sufficient justification or consideration of less restrictive means to achieve the

11   stated purposes of the Ordinance.

12                                    **PARTIES**

13       5.    Plaintiff Phillips 66 is a Delaware corporation and owns and operates the

14   Rodeo Refinery.  Petcoke produced at the Refinery is delivered by truck to the Terminal,

15   located at 402 Wright Avenue in Richmond, for transloading to ships for export to Phillips

16   66 customers.

17       6.    Defendant City of Richmond is a charter city in Contra Costa County

18   organized under the constitution and laws of the State of California.  The City, acting by

19   and through the City Council, is the municipal entity responsible for the Ordinance adopted

20   on February 4, 2020, amending the Richmond Municipal Code ("RMC") by adding Article

21   15.04.615 (Prohibition of the Storage and Handling of Coal and Petcoke) and amending

22   § 15.04.104.010 (Warehousing, Storage, and Distribution Definition).  Pursuant to the City

23   Charter, the City may be sued "in all courts and places, and in all actions and proceedings

24   whatsoever."  Richmond Charter art. II, § 1(3).

25       7.    Defendant City Council is the duly-elected legislative and decision-making

26   body within the City responsible for approving the Ordinance on behalf of the City.

27

28

1

2                          **JURISDICTION AND VENUE**

3          8.      This Court has subject-matter jurisdiction over the claims asserted in this

4    action pursuant to 28 U.S.C. § 1331 (federal question) and 42 U.S.C. § 1983, as the claims

5    herein seek to interpret and apply the Commerce Clause and the Impairments Clause of the

6    United States Constitution.

7          9.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(1) and

8    1391(b)(2) because Defendants are located within the District, a substantial part of the

9    events giving rise to the Claims occurred in the District, and a substantial part of the

10   property affected by the Ordinance is located in the District.

11         10.     The relief requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202

12   (declaratory judgment), 28 U.S.C. § 1651(a) (injunctive relief), and 42 U.S.C. § 1983

13   (declaratory and injunctive relief available for Commerce Clause violations).

14                        **INTRADISTRICT ASSIGNMENT**

15         11.     Pursuant to Civil L.R. 3-2(c) and (d) and Civil L.R. 3-5(b), there is a basis

16   for assigning this action to the San Francisco Division or the Oakland Division, as the

17   action arose in Contra Costa County.

18                          **FACTUAL BACKGROUND**

19         **A.   Phillips 66 Production and Shipment of Petcoke.**

20         12.     Phillips 66 transports petcoke from its Rodeo Refinery by means of covered

21   trucks that travel approximately 10 miles to the Terminal in Richmond.  The covers are not

22   removed during transport or unloading, and the product is transferred at the Terminal by

23   removing pins to release the bottom of the truck bed, thereby preventing spilling or

24   dispersal.  In addition to utilizing covered trucks, Phillips 66 personnel apply dust

25   suppressant to the petcoke to minimize or eliminate release of dust during transfer.  At the

26   Terminal, the petcoke is transferred to ocean-going freighters for shipment to customers in

27

28

1    Europe, Australia, Asia, and other locations, with some temporary, indoor storage and

2    handling of petcoke incidental to transfer of the product from trucks to marine vessels.

3         13.     The Terminal is the only petcoke bulk handling facility and transfer point for

4    marine shipment in Richmond. The Ordinance would deny Phillips 66 port access in that

5    area to transload and export petcoke to foreign markets. Further, there are no marine

6    facilities other than the Terminal with suitable equipment, such as deep-water berths,

7    conveyors, ship loaders and temporary storage, in the immediate area from which Phillips

8    66 can ship petcoke. As Phillips 66 advised Defendants, it would be forced to try to

9    transport petcoke by truck or rail from Rodeo to more distant marine terminal locations,

10   assuming locations with suitable capacity and equipment could be found.

11        **B.    Bay Area Air Quality Management District Air Quality Monitoring.**

12        14.     In 2015, the City Council adopted a resolution requesting that the Bay Area

13   Air Quality Management District ("BAAQMD") "regulate the storage and handling of coal

14   and petroleum coke." *See* City Council Agenda Item #G-10 (February 4, 2020). Phillips

15   66 is informed and believes that BAAQMD nominated the City for a community

16   monitoring project under the statewide Community Air Protection program established by

17   Assembly Bill 617 (C. Garcia, Chapter 136, Stat. 2017) ("AB 617"). Pursuant to AB 617,

18   the California Air Resources Control Board, BAAQMD, and community representatives are

19   partnering to study air quality to determine areas of concern and sources of air pollution in

20   the City, including potential pollutants in and around the Terminal, and to prepare an

21   emission reduction plan based on that information.

22        15.     In or about July 2018, the City submitted a proposal to BAAQMD for

23   review of a parallel coal dust monitoring study around the Terminal. BAAQMD, through

24   its Executive Officer/Air Pollution Control Officer, submitted a letter to Defendants, dated

25   July 5, 2018, stating that "the Air District believes that the upcoming community

26   monitoring plan for Richmond is the appropriate way to address concerns about coal dust

27   impacts," rather than a separate study. City Council Agenda Item #I-2 (December 3, 2019).

28

1      16.    BAAQMD also explained that an emission reduction plan for the City would

2  include regulatory, incentive, and other programs based on scientific data:

3              "Any regulations that are developed as part of the community
               emission reduction program *will need a solid technical*
4              *foundation* as the Air District is required to demonstrate that
               all regulations are reasonable, necessary and within our
5              statutory authority."   BAAQMD Letter p. 2 (emphasis
               added).
6
7      17.    BAAQMD also advised that there are many types and sources of particulate

   matter ("PM") in the City, including from other areas in the region.  Elemental carbon
8
   ("EC") is one category of particulate matter that includes diesel and other sources, in
9
   addition to coal dust:
10
              "Since coal dust is a subset of [elemental carbon] EC, which
11             includes other species such as diesel PM, further speciation
               techniques would need to be applied to differentiate coal dust
12             from EC.   Simply determining if EC is present would not
               provide enough information to determine if coal dust is
13             present.  In addition, in order to determine if coal dust is an
               historical artifact or being deposited by current sources,
14             measurements would have to be taken for a long period of
               time so that meteorological and other impacts can be 'teased
15             out.'   Simply determining if components of coal dust are
               present will not provide information on when the dust may
16             have been deposited.   As a result, *any study to determine*
               *whether coal dust is present and increased due to current*
17             *activities, would require a long-term study employing*
               *techniques not usually used to speciate typical PM* . . . a
18             study . . . would need to evaluate physical and chemical
               characteristics of the airborne particulate matter—likely in
19             multiple ways . . . it's not enough to simply determine if there
               is coal dust in the area." BAAQMD Letter pp. 2-3 (emphasis
20             added).

21     18.    According to BAAQMD, the parameters for a valid long-term study would

22  need to include specific use information and a "typical PM signature of regional urban

23  background" to design "measurements of physical and chemical characteristics of PM" for

24  at least one year that, along with sampling locations, frequency, and duration, "could

25  provide data to attribute the observed PM concentrations to various sources." BAAQMD

26  Letter p. 3.  The same parameters also would apply to a study concerning petcoke.

27  BAAQMD made clear that

28
                                      - 6 -

1    *"any monitoring plan that does not provide this level of effort would not
     provide the answer to the question of 'are current activities at the Port of
2    Richmond leading to an increase in health impacts to local residents.'"*
     *Id.* p. 4 (emphasis added.)
3

4        19.    As alleged herein, in enacting the Ordinance, Defendants ignored

5    BAAQMD's advice and failed to conduct any technically-sound long-term study that

6    employed appropriate scientific techniques to identify fugitive petcoke or coal dust near the

7    Terminal or any risk associated therewith.

8        **C.    Planning Commission Unanimous Vote to Obtain More Evidence.**

9        20.    Defendants ignored not only the BAAQMD guidance, but also the findings

10   of their own Planning Commission that a valid scientific study was needed to support any

11   such ordinance, and continued pursuing the Ordinance nonetheless as part of a political

12   agenda.

13       21.    On May 19, 2015, the City Council had adopted Resolution No. 48-15,

14   opposing the mining, export and burning of coal in general, and the "*transportation*" of coal

15   and petcoke "along California waterways," through "densely populated areas," and through

16   the City on existing rail lines and roadways.  (Emphasis added.)  The Resolution approved a

17   City policy to prohibit the use of City-owned property for coal or petcoke "storage or

18   *export*" and to "alert" other cities "along the transportation route" to support their

19   opposition to coal and petcoke "transport." *Id.* (emphasis added).

20       22.    A December 18, 2018 Agenda Request requested that the Planning

21   Commission be directed to study an ordinance affecting private property, and asserted that

22   "climate change" and the need to protect "the health of our planet" were the basis for

23   prohibiting transshipment of coal and petcoke at the Terminal, in addition to purported local

24   health risks from fugitive coal and petcoke dust.

25       23.    In April 2019, the City Council then directed City staff to prepare an

26   ordinance to amend the Richmond Zoning Ordinance to "*prohibit new land uses and phase

27   out existing land uses* related to the storage and handling of coal and petroleum coke; and to

28   modify the zoning ordinance to *remove the storage and handling of coal and petroleum*

- 7 -

1   *coke from the list of uses conditionally allowed in certain industrial zones*." City Council

2   Agenda Item #G-10 (February 4, 2020) (emphasis added). Thereafter, City staff prepared a

3   modified ordinance for the Planning Commission's consideration that addressed the items

4   as identified by the City Council. *Id.*

5   24.   On July 18, 2019, the Richmond Planning Commission held a public hearing

6   to consider a recommendation to the City Council on the proposed municipal code

7   amendments at issue herein. No scientific long-term study had been prepared as

8   recommended by BAAQMD. Phillips 66 and others submitted written comments and/or

9   public testimony to the Planning Commission opposing the proposed Ordinance on

10   numerous grounds. During the public comment period, many speakers raised concerns over

11   the loss of union jobs at the Terminal should the Ordinance be adopted, as well as the lack

12   of scientific evidence of adverse air quality impacts. Several speakers commented that the

13   City should wait until AB 617 air monitoring is completed and gather scientific data before

14   taking "drastic action."

15   25.   The owners and operator of the Terminal (Levin Enterprises, Inc., Levin

16   Richmond Terminal Corporation ("LRTC") and Richmond Pacific Railroad Corporation

17   (collectively, "Levin")), testified to the Planning Commission that the Ordinance would

18   effectively put the Terminal, which is designed for bulk exports, out of business, and that

19   there were no other viable businesses to replace current activities. Levin also submitted

20   testimony that petcoke is stored in an enclosed building with controls or is transloaded from

21   trucks directly to ships; and only a limited amount of petcoke is temporarily stored on the

22   ground with proper safeguards awaiting loading into a marine vessel. Levin also testified

23   that controls used at the Terminal include wind buffers and high-pressure watering. Phillips

24   66 is informed and believes that additional measures are also in place at the Terminal to

25   address potential dust emissions including covered conveyors, water misters, and

26   regenerative sweeping equipment.

27

28

1       26.    Levin also submitted a scientific study prepared by Sonoma Technology,

2   Inc. ("STI"), which demonstrated that existing data did not support a conclusion that the

3   Terminal "is a source of" fugitive petcoke emissions that "pose health risks or other

4   impacts" in Richmond.  *See* Initial STI Assessment (July 12, 2019) p. 23.

5       27.    Following nearly four hours of public testimony, Commissioner Tucker

6   stated the Planning Commission had been tasked with making a decision based on

7   insufficient information, including the lack of information regarding economic impact to

8   the City and data concerning air quality impacts.  The Planning Commission voted

9   unanimously against recommending adoption of the Ordinance, and instead adopted

10  Resolution 19-29 (July 18, 2019) recommending that the City Council defer consideration

11  of the proposed ordinance until completion of an air monitoring study to determine if the

12  Terminal is a source of fugitive coal and petcoke dust that poses health risks, and until an

13  economic impact report is prepared concerning the effect of the ordinance on jobs and the

14  community.  Resolution 19-29 stated in part:

15          "[T]he Richmond Planning Commission does *not* find that the
        storage and handling of coal and petroleum coke is an
16          undesirable land use; and . . . recommends that the City
        Council *not* adopt an ordinance . . . prohibiting the storage
17          and handling of coal and petroleum coke, . . . ***cannot find*** that
        the proposed ordinance is necessary for public health, safety
18          and welfare, and expressed its position that ***additional study***
        ***is needed*** to better understand the air quality impacts of
19          operations at existing sites . . . [and] the potential economic
20          impacts to the City of Richmond . . . ."  (Emphasis added.)

21  **D.   City Council Adoption of the Ordinance.**

22      28.    On December 3, 2019, the City Council held a public hearing to consider the

23  Ordinance.  Prior to that hearing, and in line with the Planning Commission's

24  recommendations, Levin submitted an actual air monitoring study and economic impact

25  analysis to the City.  STI completed a preliminary screening study of air quality monitoring

26  data (correlated to wind speed and direction) at the Terminal from April 19, 2019 through

27

28

4849-2758-6486.v1

1   July 31, 2019, finding that the data did not support a conclusion that the Terminal was a

2   source of harmful fugitive dust emissions.  STI Supplemental Report pp. 2, 11-16.

3   Levin also submitted information that adoption of the Ordinance would "put LRTC out of

4   business" and result in the loss of 62 jobs, including jobs held by Richmond residents and

5   48 members of Operating Engineers Union Local 3.

6       29.     On November 19, 2019, Phillips 66 submitted a letter to the City Council in

7   opposition to the Ordinance, asserting that, in light of the STI studies, the BAAQMD

8   correspondence and other information, there was no scientific basis for concluding that

9   fugitive dust from the storage and handling of petcoke at the Terminal posed any health

10  risks or environmental impacts.

11      30.     On January 14, 2020, the City Council conducted a first reading and voted to

12  approve the Ordinance.  On February 4, 2020, the City Council conducted a second reading

13  and adopted the Ordinance by Consent Calendar approval.  Under applicable State law, the

14  Ordinance takes effect 30 days following adoption.

15      31.     In adopting the Ordinance, Defendants ignored the advice of BAAQMD and

16  their own Planning Commission to obtain a scientifically-valid, long-term study of (alleged)

17  fugitive emissions associated with coal or petcoke handled at the Terminal; ignored the

18  scientific information provided by STI; and passed the Ordinance without a scientific basis

19  or credible evidence of putative local benefits.  There was no credible evidence before the

20  City Council that fugitive dust from the temporary storage and handling of petcoke at the

21  Terminal poses health risks or environmental impacts.

22      32.     Instead, the Ordinance reflects Defendants' imposition of extraterritorial

23  political objections to the commodities of coal and petcoke.  The initial December 18, 2018

24  Agenda Report to the City Council, referenced above, stated that an objective of the

25  Ordinance would be to reduce coal (and petcoke) burning in "the city, state, country, and

26  world."  However, petcoke is not burned in the City or the State, and instead is exported

27  primarily for use in the manufacture of many products as alleged above.  Defendants have

28

1    no jurisdiction to regulate interstate or foreign commerce in petcoke under the guise of an

2    unlawful local ordinance.

3         33.    Defendants also attempted to downplay the consequences of their actions.

4    The Agenda Report for the December 3, 2019 hearing stated that the Ordinance "does not

5    regulate the transportation of" petcoke "through" the City or "to or from" a facility where

6    petcoke is stored or handled. Agenda Report p. 3. The Ordinance does, however, directly

7    obstruct the transportation of petcoke. It prohibits intermodal transloading operations and

8    activities (receipt, storage, handling, interchange, loading or unloading, or "transfer in

9    transit" of goods) that are a necessary component of transportation, particularly for overseas

10    export, at the only available marine terminal in the immediate area. *See Grosso v. Surface*

11    *Transp. Bd.* (1st Cir. 2015) 804 F.3d 110, 114, 118 (citation omitted); *California Tow Truck*

12    *Assn. v. City and County of San Francisco* (9th Cir. 2015) 797 F.3d 733, 753, n. 15

13    (transportation means services related to movement of property, including transfer in

14    transit, storage, and handling) (citation omitted).

15       **E.    The Ordinance and Findings.**

16         34.    The Ordinance contains recitals that "storing, loading, unloading,

17    stockpiling, and/or otherwise handling coal and/or petroleum coke, temporarily or

18    permanently, in the City of Richmond, is associated with and/or causes health and safety

19    impacts in humans," including due to "fugitive coal dust," and can negatively impact the

20    environment. Ordinance pp. 1-2. The recitals include conclusory statements that "health

21    and environmental problems" result from petcoke "storage and handling" (*Id.* p. 2) and that

22    the Ordinance is "necessary" for "public health safety" in order to "reduce particulate

23    matter emissions and toxic exposure" from petcoke "storage" and reduce pollution burdens

24    "near certain industrial areas" (*Id.* p. 5).

25         35.    However, the record before Respondents demonstrated that such findings

26    lacked scientific evidence or a basis in fact, and there was no credible evidence before the

27

28

4849-2758-6486.v1

1  City Council of fugitive petcoke emissions at the Terminal or any "associated" health and
2  safety or environmental impacts.

3      36.    RMC Article 15.04.615, as passed, prohibits and "bans the establishment
4  and/or expansion of" "storage and handling" of petcoke in the City (with certain exceptions
5  for non-commercial uses) and "phases out" existing allowed uses, meaning the Terminal.
6  §§ 15.04.615.010(B), 15.04.615.030, 15.04.104.010 (removing petcoke from definition of
7  chemical, mineral, and explosives storage). "Storage and handling" are broadly defined to
8  include even covered or underground piles, or storage within containers. *See*
9  § 15.04.615.020(F). The City also retains "authority to *immediately* terminate, discontinue,
10  or abate any land uses found to be a nuisance." § 15.04.615.050(K) (emphasis added).

11      37.    While the stated intent of Article 15.04.615 is to "protect and promote"
12  health, safety and welfare by "reducing the release of pollutants" and reducing "adverse
13  impacts to property values, aesthetics, and economic interests" as a result of petcoke and
14  coal storage and handling (Section 15.04.615.010(A)), none of those alleged adverse
15  impacts were supported by evidence as heretofore alleged; nor did Respondents at any time
16  consider less restrictive means to accomplish their purported objectives, even assuming
17  such evidence had been provided.

18      **F.   Limitations on City Ordinances and Regulations.**

19      38.    As a charter city, the City "may make and enforce all ordinances and
20  regulations in respect to municipal affairs," subject to limits imposed by the terms of its
21  charter (Cal. Const. art. XI, § 5(a)), the Federal and State Constitutions, preempting federal
22  and state legislation, and laws which the Legislature requires charter cities to obey. *Id.*;
23  U.S. Const., art. VI, § 2; City Charter art. IX, § 10; Gov. Code § 65700. In respect to
24  matters of regional or statewide concern the City is subject to general laws. Cal. Const. art.
25  XI, § 5(a).

26      39.    The City Charter requires that Defendants exercise their police powers to
27  make "necessary" police and sanitary regulations. City Charter art. II, § 1(6). Under RMC
28

1   Section 15.04.814.050, a zoning amendment must be "necessary" for public health, safety,

2   and general welfare or of benefit to the public.

3                                **CLAIMS FOR RELIEF**

4                                   **FIRST CLAIM**

5                          **(Violation of the Commerce Clause)**

6          40.    Phillips 66 realleges and reincorporates by reference the allegations

7   contained in paragraphs 1-39, inclusive.

8          41.    The Constitution, through the Foreign Commerce Clause, grants Congress

9   authority to "regulate Commerce with foreign Nations" (Art. I, § 8, cl. 3) and limits the

10   power of States or municipalities to regulate such commerce under the so-called dormant

11   Foreign Commerce Clause (*see, e.g., Japan Line, Ltd. v. County of Los Angeles*, 441 U.S.

12   434, 449-454, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979)).

13          42.    The Commerce Clause also authorizes Congress to "regulate" commerce

14   "among the several States" (Art. I, § 8, cl. 3) and denies States or municipalities the power

15   "unjustifiably to discriminate against or burden the interstate flow of articles of commerce."

16   *Or. Waste Sys., Inc. v. Dep't of Envtl. Quality*, 511 U.S. 93, 98, 114 S.Ct. 1345, 128

17   L.Ed.2d 13 (1994).  Congress regulates the channels, instrumentalities, and activities that

18   substantially affect interstate commerce.  *United States v. Lopez*, 514 U.S. 549, 558-559,

19   115 S.Ct. 1624, 131 L.Ed.2d 626 (1995).

20          43.    Defendants' decision to deny Phillips 66 access to the Terminal to transship

21   and export petcoke impermissibly infringes on the Federal Government's exclusive role to

22   regulate interstate and foreign commerce.  A California municipality "may not exercise its

23   governmental functions beyond its . . . boundaries" or legislate the conduct of business

24   outside its territorial limits.  *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d

25   461, 473 (9th Cir. 2001) (quoting *City of Oakland v. Brock*, 8 Cal.2d 639, 67 P.2d 344, 345

26   (1937)) (emphasis omitted).

27

28

1      44.     For the reasons alleged herein, the Ordinance significantly impairs the

2   inherently national interest in an efficient and uniform system of transportation of

3   commodities in interstate and foreign commerce. The Ordinance effectively prohibits all

4   shipments of petcoke to and through the Terminal. However, the loading, unloading,

5   transloading, transferring, storage and/or other handling of coal and petcoke are necessary

6   and inextricable parts of a uniform system of transportation and export, particularly where

7   the primary function of the Terminal is truck-to-ship transfer of bulk material for

8   international export. Thus, the Ordinance impermissibly directly regulates and burdens the

9   interstate and foreign components of commerce by prohibiting the flow of interstate goods

10   and the transportation and export of petcoke and coal.

11      45.     If numerous municipalities, including cities with waterway and marine

12   access, regionwide or nationwide continue to adopt ordinances like Richmond's, the

13   national and international market for coal and petcoke will be stifled.

14      46.     The Ordinance also imposes significant burdens on foreign and interstate

15   commerce that clearly outweigh and are "clearly excessive" in relation to the "putative local

16   benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174

17   (1970). While Defendants asserted the purpose in adopting the Ordinance was to "protect

18   the public" from the alleged "hazards of fugitive dust emissions from coal and petroleum

19   coke" and "the health hazards of coal and petroleum coke storage and handling,"

20   Defendants failed to undertake any scientifically-valid long-term study and the record

21   before them lacked any credible evidence of fugitive petcoke dust emissions in the City,

22   and no evidence of any health hazard posed by petcoke "storage and handling," including

23   transloading or temporary storage in the City. The Ordinance's excessive burden on

24   interstate and foreign commerce is unnecessary for the protection of the interests of the

25   citizens of the City and constituted an unreasonable exercise of the City's police power.

26      47.     Even assuming there were evidence of fugitive petcoke or coal dust

27   emissions posing any potential health risk, Defendants adopted overly restrictive means,

28

1     precluding even covered, underground, or container storage of petcoke, or other less

2     restrictive measures that could control fugitive dust emissions, opting instead for an

3     outright ban on all such activities which have been conducted for decades with no evidence

4     of public risk.

5          48.     Accordingly, Phillips 66's interests will be materially and irreparably

6     harmed if the Ordinance goes into effect and is implemented by Defendants.  Phillips 66

7     therefore seeks a declaration in this Court that the Ordinance is in violation of the

8     Commerce Clause and should be set aside and enjoined on that basis.

9                            **SECOND CAUSE OF ACTION**

10                   **(Unconstitutional Impairment of Contract,**

11                      **U.S. Const., Art. 1, § 10)**

12          49.     Petitioner incorporates herein by reference the allegations contained in

13     paragraphs 1-48, inclusive.

14          50.     For the reasons alleged, the Ordinance also violates the Impairments Clause

15     of the United States Constitution, Art. 1, § 10, which prohibits local laws or ordinances

16     impairing the obligation of contracts.

17          51.     Phillips 66 has in place a long-standing contract with the Richmond-Levin

18     Terminal for transloading, including storage and handling, of petcoke shipped in interstate

19     and foreign commerce, as well as numerous contracts with the purchasers of petcoke.  The

20     Ordinance operates as a substantial and unjustified impairment of the obligations of those

21     contractual relationships, in prohibiting the storage and handling of petcoke in a manner

22     unnecessary to protect public health.

23          52.     Further, the Ordinance does not affect the rights and responsibilities of the

24     contracting parties based upon reasonable conditions.  While pursuing a broad political

25     agenda relating to climate change, Defendants failed even to consider less restrictive means

26     to achieve the (purported) public health and safety purposes of the Ordinance.  Instead,

27     subject to the phase-out period, the Ordinance operates as an arbitrary and absolute ban on

28

COMPLAINT

4849-2758-6486.v1

1   temporary or permanent petcoke storage and handling at the Terminal (whether

2   underground, in containers, or otherwise enclosed), and without any consideration of

3   potential mitigation of such claimed impacts, much less any credible scientific basis for the

4   claimed public health impacts asserted in the Ordinance in the first instance. *Energy*

5   *Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400 (1983); *Ross v. City of*

6   *Berkeley,* 655 F. Supp. 820 (N.D. Cal. 1987).

7       53.    Accordingly, Phillips 66's interests will be materially and irreparably

8   harmed if the Ordinance goes into effect and is implemented by Defendants, thereby

9   precluding shipment and export of petcoke through the Terminal.  Phillips 66 therefore

10  seeks a declaration in this Court that the Ordinance is in violation of the Impairments

11  Clause and should be set aside and enjoined on that basis.

12                      **PRAYER FOR RELIEF**

13  WHEREFORE, Phillips 66 respectfully prays that this Court:

14      A.     Issue a declaratory judgment, pursuant to 28 U.S.C. § 2201, 42 U.S.C.

15  § 1983, and/or Rule 57 of the Federal Rules of Civil Procedure, that the Ordinance violates

16  the Commerce Clause and/or the Impairments Clause of the United States Constitution;

17      B.     Issue a permanent injunction, pursuant to 28 U.S.C. § 1651, 42 U.S.C.

18  § 1983, and/or Rule 65 of the Federal Rules of Civil Procedure, enjoining Defendants from

19  applying the Ordinance to the Terminal and/or the storage or handling of petcoke;

20      C.     Award costs and reasonable attorneys' fees to Phillips 66; and

21  //
    //
22  //
    //
23  //
    //
24  //
    //
25  //
    //
26  //
    //
27  //
    //
28

4849-2758-6486.v1

1    D.    Grant such other relief as the Court deems just and proper.

2

3  Dated: March 6, 2020.        Respectfully submitted,

4                   PILLSBURY WINTHROP SHAW PITTMAN LLP
                     RONALD E. VAN BUSKIRK

5                   MARGARET ROSEGAY
                     Four Embarcadero Center, 22nd Floor

6                   Post Office Box 2824
                     San Francisco, CA  94126-2824

7

8               By _____

9                   Ronald E. Van Buskirk
                     Attorneys for Plaintiff,

10                 PHILLIPS 66 COMPANY

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -