ANTHONY L. RAMPTON (2681)
KATHY A.F. DAVIS (4022)
Utah Assistant Attorneys General
SEAN D. REYES (7969)
UTAH ATTORNEY GENERAL
5110 State Office Building
Post Office Box 142477
Salt Lake City, UT 84114-2477
arampton@agutah.gov
kathydavis@agutah.gov
Telephone: (801) 537-9819

*Attorneys for Proposed Plaintiff-Intervenor State of Utah*

---

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEVIN RICHMOND TERMINAL CORPORATION, et al., <br> *Plaintiffs*, <br> and <br><br> STATE OF UTAH, <br> *Proposed Plaintiff-Intervenor*, <br> v. <br><br> CITY OF RICHMOND, et al., <br> *Defendants*, <br> and <br><br> SIERRA CLUB and SAN FRANCISCO BAYKEEPER, <br> *Defendant-Intervenors*, | Case Nos. 4:20-cv-01609-YGR <br> 4:20-cv-01614 YGR <br> 4:20-cv-01643-YGR <br><br><br> **STATE OF UTAH'S NOTICE OF MOTION, MOTION TO INTERVENE, and MEMORANDUM IN SUPPORT OF MOTION TO INTERVENE** <br><br><br> Honorable Yvonne Gonzalez Rogers |
| WOLVERINE FUELS SALES, LLC <br> *Plaintiff*, <br> and <br><br> STATE OF UTAH, <br> *Proposed Plaintiff-Intervenor*, <br> v. <br><br> CITY OF RICHMOND, et al., <br> *Defendants*, | Date: November 24, 2020 <br> Time: 2:00 p.m. <br> Place: Courtroom 1 <br> 1301 Clay Street, Oakland, CA |

STATE OF UTAH'S MOTION TO INTERVENE / Case Nos. 4:20-cv-01609-YGR; 4:20-cv-01614 YGR; 4:20-cv-01643-YGR

and

SIERRA CLUB and SAN FRANCISCO
BAYKEEPER,
       *Defendant-Intervenors*,

PHILLIPS 66 COMPANY,
       *Plaintiff*,
  and

STATE OF UTAH,
       *Proposed Plaintiff-Intervenor*,
  v.

CITY OF RICHMOND, et al.
       *Defendants*,
  and

SIERRA CLUB and SAN FRANCISCO
BAYKEEPER,
       *Defendant-Intervenors*.

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT the State of Utah hereby moves the Court for leave to Intervene in the above-captioned cases.

NOTICE IS HEREBY GIVEN, pursuant to Civil Local Rule 7-2, that on Tuesday, November 24, 2020 at 2:00 p.m., or as soon thereafter as the matter may be heard, in the courtroom of the Honorable Yvonne Gonzalez Rogers, at the United States Courthouse, 1301 Clay Street, Oakland, CA 94612, the State of Utah ("Utah"), by counsel, will move the Court for leave to intervene as Plaintiff-Intervenor in the above-entitled actions. Pursuant to Federal Rule of Civil Procedure 24, Utah respectfully moves to intervene as a Plaintiff-Intervenor in the above-captioned related cases. Counsel for Plaintiffs Wolverine Fuels Sales, LLC ("Wolverine"), Levin Richmond Terminal Corporation, Richmond Pacific Railroad Corporation, and Levin Enterprises (collectively "Levin") and Phillips 66 Company ("Phillips 66") have been consulted and have consented to Utah's intervention. Defendants City of Richmond ("City") and City

Council of the City of Richmond ("Council") (The City and Council are also sometimes collectively "Richmond") oppose intervention; Counsel for Defendant-Intervenors Sierra Club and San Francisco Baykeeper have not responded to Utah's request that they indicate their position on Utah's motion. This motion is supported by the accompanying Memorandum. A proposed form of Order also accompanies this motion.

WHEREFORE, Utah prays that the Court grant the instant motion, and thereby grant Utah leave to intervene as a Plaintiff in these actions. If intervention is granted, Utah will file the Complaint attached hereto as Exhibit "A." Utah further agrees to, and will comply with, the schedule set forth in the Minute Entry of this Court dated September 24, 2020 (Dkt. 69) (the "Scheduling Order").

**INTRODUCTION**

On February 4, 2020, Richmond adopted Ordinance No. 05-20 N.S. entitled "Prohibition on the Storage and Handling of Coal and Petroleum Coke" (the "Ordinance"), following action by the City's Planning Commission, which had unanimously recommended that the City Council "not adopt the proposed ordinance." The Ordinance restricted the storage and handling of coal in the City. Wolverine mines coal in Utah for transport by rail to the Levin Richmond Terminal ("Levin Terminal") for marine vessel export to ultimate buyers in Japan.[1]

---

[1] Coal is the primary fuel used for electricity production throughout the world. Global demand for coal is expected to remain largely stable through 2024, driven by robust economic growth and the construction of new coal-fired power plants in Asia. "Coal Will Remain World's Largest Source of Electricity Through 2024," Yale Environment 360, December 18, 2019. The State of Utah produced nearly 14 million short tons of coal in 2018 and ranked 11th out of 23 coal producing states in 2018 for coal produced. Thousands of Utahns are employed to mine, transport, and handle its coal, and to service its mining operations. Coal mining is a significant component of Utah's economy, accounting for an annual economic impact of approximately $300,000,000 per year. Kem C. Gardner Policy Institute, University of Utah (Feb. 2020), p. 9; https://gardner.utah.edu/wp-content/uploads/EnergyReport-Feb2020.pdf (last visited 9/28/2020). *See also*, discussion *infra* in "Background." Of the several types of coal found in the earth, Utah's coal is remarkable for its low sulfur, low moisture, low ash content, and high calorific content, making it an extremely desirable and sought-after source of high temperature, low emission fuel for high efficiency coal-fired power plants throughout the world "The Structure and Economic Impact of Utah's Coal Industry," Perlich, Hogue, Downen, Bureau of Economic and Business Research, David Eccles School of Business University of Utah, May 2010.

1   This coal is handled and temporarily stored at the Levin Terminal for transloading and export to

2   Japan. The Ordinance would prohibit these shipping activities.

3       Wolverine brought this action to enjoin enforcement of the Ordinance alleging that it

4   violates provisions of the United States Constitution by unduly burdening interstate and

5   foreign commerce in violation of the Commerce Clause (Article 1 section 8), impairing the

6   rights and obligations of Wolverine contracts in violation of Article 1 section 10, and

7   violating Wolverine's due process rights, both substantive and procedural, under the Fifth

8   and Fourteenth Amendments of the Constitution and seeking a declaratory judgment that the

9   Ordinance is unconstitutional and is preempted by Federal law. (Dkt. 1). Phillips 66 and

10  Levin brought separate actions. An Order Relating Cases regarding the above three

11  captioned cases was entered by the Court on March 23, 2020. Richmond filed a Motion to

12  Dismiss (Dkt. 20) which Wolverine opposed (Dkt. 37). Defendant-Intervenors also filed a

13  Motion to Dismiss (Dkt. 40), which Wolverine opposed (Dkt. 41). Utah filed an Amicus

14  Brief (Dkt. 46) in support of Wolverine's Opposition. The Court granted the motion in part

15  and denied it in part on August 27, 2020 (Dkt. 67). The court also granted Utah's (and other

16  amici's) Motions to file their amici briefs. (*Id.*)

17      Utah seeks to intervene on the basis that the Ordinance violates the United States

18  Commerce Clause of the United States Constitution. Utah should be entitled to intervene as a

19  matter of right in this case. Its motion is timely, as the Scheduling Order (Dkt.74) has only

20  recently been entered with deadlines beginning in April 2021, and Utah's proposed Complaint

21  does not add any new constitutional claims not already at issue in this case.  The parties have yet

22  propounded discovery. Utah has protectable interests in this litigation, given that coal is a source

23  of a significant stream of revenue to Utah and Utah has a sovereign interest in regulating mining

24  that takes place in Utah. Utah is landlocked and relies upon the availability of deep-water ports

25  such as the Levin Terminal to reach Japanese markets. The State's ability to protect its interests

26  would be impaired by a disposition of this case favorable to Defendants. The Plaintiffs in these

27  related cases are not able to adequately represent the unique interests of the Utah as a Sovereign.

28

1  If permitted to intervene, Utah will file the attached Complaint (Exhibit "A"). If

2  intervention is granted either as of right or permissively, Utah agrees to, and will comply with,

3  the Scheduling Order (Dkt. 69). If intervention is granted only permissively, Utah agrees to be

4  subject to the same limitations as those imposed on Defendant-Intervenors by this court in its

5  Order (1) Granting in In Part and Denying in Part Motions to Dismiss; and (2) Granting Motions

6  to Intervene and Amici Motions entered on August 27, 2020 (Dkt. 67).

7  **BACKGROUND**

8  The impact of the coal industry in Utah is significant. Utah has an estimated 15.5 billion

9  short tons of recoverable coal. At 14.4 million short tons in 2017, Utah was the 11th largest coal

10  producer in the country. *Economic Impacts of Utah's Energy Industry, 2017*, Downen, Holst,

11  Vanden Berg; Kem C. Gardner Policy Institute, University of Utah (Feb. 2020), p. 9;

12  https://gardner.utah.edu/wp-content/uploads/EnergyReport-Feb2020.pdf (last visited 9/28/2020).

13  Utah depends on taxes and other revenues from coal mining and production to fund critical state

14  and local infrastructure and programs. Coal severance taxes and other coal revenues generate tens

15  of millions of dollars annually in state revenue. https://archive.unews.utah.edu/news_releases/

16  economic-impact-of-coal-on-utah-economy-means-jobs-tax-revenue/#:~:text=%E2%80%9C

17  Utah%E2%80%99s%20coal%20industry%20has%20played%20a%20significant%20role,to%20

18  date%20is%20just%20over%201%20billion%20tons.%E2%80%9D.  (last visited October 4,

19  2020). Utah mines produced $493.1 million worth of coal in 2017 (in nominal dollars), providing

20  almost 1,500 direct jobs with $157.9 million in earnings and contributing $309.7 million to the

21  state's Gross Domestic Product ("GDP"). Downen *et. al.* at p. 9. Coal jobs are high paying, with

22  2017 average annual earnings of $105,500, double the statewide average of $50,655. *Id.* Utah's

23  2017 coal production generated total economic impacts of 5,228 jobs, $343.0 million in earnings,

24  and $612.1 million in state GDP. *Id.* In 2017, 64% of the coal produced in Utah was consumed in

25  Utah. One-fifth of the state's coal was exported internationally, mostly to Asia. *Id.* at p.8.

26  However, in 2017, mine output was 40% lower than in 2008 and almost 47% below the state's

27  peak in 1996. *Id.* at pp.8-9.

28

Wolverine is one of several coal mining companies in Utah that sources the highest quality coal available for its customers in Japan.[2] (Wolverine Complaint, Dkt. 1, ¶ 15). Japan is dependent on imports for its energy, especially following the Fukushima nuclear power plant accident. Japan is installing clean coal plant technologies to meet environmental targets, and it plans "to develop about 45 additional coal powerplants, adding more than 20 GW of capacity in the next decade." U.S. Energy Information Administration, Japan: Overview (February 2, 2017), https://perma.cc/B97V-UZTU (last visited October 4, 2020).

In 2015, the Council adopted a resolution banning the storage and export of coal and petcoke on city-owned property. The resolution also included a non-binding statement that the Richmond City Council opposed the transportation of coal and petcoke along California waterways, through densely populated areas, and through the City on existing rail lines and roadways. In February of 2020, Richmond adopted the Ordinance, extending the prohibition on the storage and handling of coal and petcoke to all property in Richmond, including the Levin Terminal. In the Ordinance recitals, Richmond claimed that the dust from coal and petcoke storage and handling was associated with negative health and safety impacts on disadvantaged communities in Richmond that were disproportionately burdened by and vulnerable to multiple sources of pollution. The stated purpose of the Ordinance was to "protect and promote the health, safety and welfare of the City's citizens, visitors, and workers by reducing the release of pollutants into the environment" and "reduce the public health, safety, or welfare impacts" caused by the storage of handling of coal and petcoke.

The Levin Terminal is the only business entity storing and handling coal and petcoke in Richmond and is merely a point of transfer for these commodities in interstate and foreign

---

[2] Utah coal production is expected to increase by a significant 11.2% in 2019 to 15.3 million short tons—due to a resurgence in the overseas export market—but still be well below the 24.5 million tons averaged in the 2000s. Declining Utah coal production started during the 2008 recession, but demand has not rebounded like other energy commodities since coal has dropped out of favor as a fuel for American electric and industrial needs. Production at the three Wolverine mines—Skyline, Dugout, and Sufco—increased about 500,000 tons in 2019 and accounted for 63% of Utah's total coal production. https://gardner.utah.edu/wp-content/uploads/ERG2020.pdf (last visited 10/6/2020).

commerce. Accordingly, when enforced, the effect of the Ordinance in prohibiting storage and handling of coal and petcoke at the Levin Terminal will make the Levin terminal unavailable for transloading. It will also directly affect rail and vessel operations, necessitating redirection of shipments and transportation of these commodities to more distant marine terminals to meet customer needs, or the discontinuation of such rail, truck and overseas shipments entirely. Through its passage of the Ordinance, Richmond has made itself a gatekeeper for interstate and international commerce based on what it alone concludes are good public health and environmental policies, all in violation of the Commerce Clause of the United States Constitution. This gatekeeping by Richmond severely affects state and local economies in the State of Utah, as well as the state and local infrastructure programs supported by revenue received from Utah's coal economy.

## ARGUMENT

### I.   The State of Utah is entitled to intervene as a matter of right.

Courts permit intervention by any party who: (1) timely applies to intervene; (2) has a significantly protectable interest related to the subject of the action; (3) is situated such that disposition of the matter may practically impair its ability to protect that interest; and (4) shows that the existing parties do not adequately represent that interest. Fed. R. Civ. P. 24(a)(2); *see also Arakaki v. Cayetano*, 324 F.3d 1078, 1083 (9th Cir. 2003). The courts "construe Rule 24(a)(2) liberally in favor of potential intervenors." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 440 (9th Cir. 2006). The Tenth Circuit has stated that the Rule 24(a)(2) "factors are not rigid, technical requirements." *San Juan Cty., Utah v. United States*, 503 F.3d 1163, 1195 (10th Cir. 2007) (*en banc*) (plurality). Instead, they are merely "intended to capture the circumstance in which the practical effect on the prospective intervenor justifies intervention." *Id*. Based on these factors, the State of Utah is entitled to intervene as of right.

### A.  Utah's motion to intervene in the early stages of this case is timely.

Among the factors to be considered in evaluating timeliness are: "(1) the stage of the proceeding at which an applicant seeks to intervene; (2) the prejudice to other parties; and (3) the reason for and length of the delay." *Peruta v. Cty. of San Diego*, 824 F.3d 919, 940 (9th Cir. 2016) (quoting *United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004)). Here, no party can claim that it has been prejudiced by any delay. *See United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004); *Day v. Apoliona*, 505 F.3d 963, 965 (9th Cir. 2007) (deeming motion timely when made two years after case was filed); *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 854 (9th Cir. 2016) (deeming motion timely when made twenty years after case was filed, because the "[m]ere lapse of time alone is not determinative").

Utah learned of this action during the months after it was filed, and immediately undertook to evaluate its position on intervention. It filed an Amicus Brief in Support of Wolverine's Opposition to Defendant's Motion to Dismiss (Dkt. 46). Utah now seeks to intervene while the matter is still in its early stages. Defendants' and Defendant Intervenors' Motion to Dismiss (Dkt. 20, 30) were denied in part and granted in part by this Court on August 27, 2020 (Dkt. 67). Defendants and Defendant-Intervenors filed their answers to the Wolverine Complaint on September 14, 2020 (Dkt. 70, 71), less than a month prior to the filing of this Motion to Intervene. Discovery has not yet commenced. A Case Management Conference was held on September 28, 2020 setting deadlines in this case with the earliest deadline of fact discovery, which is to be concluded by April 30, 2021 (Dkt. 74). Utah agrees to be bound by and conform with the Case Management Order. Accordingly, there will be no prejudice to any of the parties if Utah is allowed to intervene. The motion is timely.

**B. The State of Utah has a significantly protectable interest related to the subject of this action.**

A party has a sufficient interest for intervention "if it will suffer a practical impairment of its interests as a result of the pending litigation." *California ex rel. Lockyer v. United States*, 450 F.3d 436, 441 (9th Cir. 2006). Similarly, a party has a protectable interest in the outcome of a suit that might, "as a practical matter, bear significantly on the resolution of [its] claims" in a

"related action." *United States v. Stringfellow*, 783 F.2d 821, 826 (9th Cir. 1986), vacated on other grounds sub nom, *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370 (1987).

Economic impacts on government entities implicate a concrete and particularized state interest. *See City of Sausalito v. O'Neill*, 386 F.3d 1186, 1198-99 (9th Cir. 2004) (holding that potential lost taxes derived from tourist revenues are of sufficient economic concern to trigger a government entity's legally cognizable and protectable proprietary interest, thereby conferring Article III standing). To trigger a right to intervene, an economic interest must be concrete and related to the underlying subject matter of the action. *See Arakaki* at 1085; *So. Cal. Edison Co. v. Lynch*, 307 F.3d 794, 803 (9th Cir. 2002).

Further, in *WildEarth Guardians v. National Park Service*, the Tenth Circuit stated that "[t]he interest element is a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process." 604 F.3d 1192, 1198 (10th Cir. 2010). The proposed intervenor's interest is "measured in terms of its relationship to the property or transaction that is the subject of the action, not in terms of the particular issue before the district court." *Id*. Additionally, "[t]he threat of economic injury from the outcome of litigation undoubtedly gives a petitioner the requisite interest." *Utahns for Better Transp. v. U.S. Dep't of Transp*., 295 F.3d 1111, 1115 (10th Cir. 2002).

Utah's interests have previously been briefed in its Amicus Brief in Opposition to Defendants' Motion to Dismiss, the arguments of which are fully adopted herein. (Dkt. 46). Utah has an interest in both the subject matter and legal implications of the controversy currently before this Court. Utah meets the interest element because it derives substantial economic benefit from the mining, transportation and sale of Utah coal to foreign markets, including the Asian market. As a landlocked state, Utah requires coastal terminals to transport and export coal via marine vessel. (Dkt. 46 at 1.) The Levin Terminal represents "one of the few remaining west coast terminals" and amounts to an integral facet of coal exports to Japan. (*See id.* at 5.) As set forth above, in addition to supporting and fulfilling important national policies and priorities, the Levin Terminal sustains a significant component of Utah's economy, provides millions of dollars in annual tax revenue, enables the State to provide critical state and

local infrastructure programs, and supplies thousands of high-paying jobs to its rural counties. (*See id.* at 1 nn.1–2.)

If the Ordinance is enforced, the resulting economic loss to Utah would be substantial, whereas the burden of showing that disposition of a case will impair a prospective intervenor's ability to protect its interests is "minimal." *WildEarth Guardians*, 604 F.3d at 1199 (internal citation omitted). In evaluating the impairment element, "the court is not limited to consequences of a strictly legal nature." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1253 (10th Cir. 2001) (internal citation and quotation omitted). "[A] would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied." *Id*. (internal citation and quotation omitted).

In addition, Utah has an interest in offering its perspectives on the Constitutional issues implicated by the present matters. Specifically, the City's Ordinance discriminates against landlocked states such as Utah by impairing the ability to transload coal for shipment overseas and by impairing shipment extraterritorially. (Dkt. 46 at 5.) Indeed, the Ordinance regulates and interferes with conduct entirely outside the City's borders, as the coal is neither mined nor distributed in Richmond. (*See id.*) Put simply, Utah has an interest in preventing a municipality from imposing a substantial and unwarranted burden on interstate and foreign commerce and from interfering with national policies that guide the State's energy economy.

### C.  A disposition of this case favorable to Richmond would impair the ability of Utah to protect its interests.

The third requirement of Rule 24(a)(2) is satisfied when the suit "may as a practical matter impair or impede [an applicant's] ability to safeguard [its] protectable interest." *Smith v. Los Angeles Unified Sch. Dist.*, 830 F.3d 843, 862 (9th Cir. 2016). In evaluating the impairment element, "the court is not limited to consequences of a strictly legal nature." *Utah Ass'n of Counties v. Clinton*, 255 F.3d 1246, 1253 (10th Cir. 2001) (internal citation and quotation omitted). "[A] would-be intervenor must show only that impairment of its substantial legal interest is possible if intervention is denied." *Id*. (internal citation and quotation omitted). The possible "impairment must result from a pending action or judgment of the court." *United*

1  *States v. N. Colo. Water Conservancy Dist*., 251 F.R.D. 590, 598 (D. Colo. 2008) (emphasis

2  and citation omitted).

3       The Court's denial of the State's intervention in this case could impair the State's ability

4  to protect its interests in the continued operation of Wolverine coal activities in Utah and export

5  of that coal through Levin Terminal, and an uninterrupted revenue stream that is vital to the

6  economy of the Utah. Accordingly, Utah has met the minimal burden of showing that

7  disposition of this matter will likely impair its ability to protect its interests if it is not allowed

8  to intervene.

9           **D.  The Plaintiffs cannot adequately represent the interests of Utah.**

10      The burden of showing that other parties cannot adequately represent an intervenor's

11 interests is "minimal" and a movant need only show that representation of its interest "may be"

12 inadequate. *Citizens for Balanced Use v. Montana Wilderness Ass'n*, 647 F.3d 893, 898 (9th

13 Cir. 2011) (quoting *Trbovich v. United Mine Workers*, 404 U.S. 528, 538 n. 10 (1972)). The

14 Ninth Circuit has "stress[ed] that intervention of right does not require an absolute certainty that

15 a party's interests will be impaired or that existing parties will not adequately represent its

16 interests." *Id.* at 900. Rule 24 advisory committee notes state that "'if an absentee would be

17 substantially affected in a practical sense by the determination made in an action, [it] should, as

18 a general rule, be entitled to intervene.'" *Arakaki*, 324 F.3d at 1086 (quoting *Sw. Ctr. for

19 Biological Diversity v. Berg*, 268 F.3d 810, 822 (9th Cir. 2001)).

20      Three factors are relevant to determining whether a proposed intervenor's interests are

21 adequately represented: "(1) whether the interest of a present party is such that it will

22 undoubtedly make all of a proposed intervenor's arguments; (2) whether the present party is

23 capable and willing to make such arguments; and (3) whether the proposed intervenor would

24 offer any necessary elements to the proceeding that other parties would neglect." *Arakaki*, 324

25 F.3d at 1086.

26      The interests of the related Plaintiffs in this case are clearly not the same as the interests

27 of Utah. Utah's interests as a Sovereign in protecting state revenue and infrastructure that

28 benefit the citizens of the state differ from the related Plaintiffs' individual economic and profit

1  interests. The related Plaintiffs cannot make Utah's arguments nor would they adequately

2  represent Utah's interests in this litigation. *Id*. The State of Utah meets the inadequacy of

3  representation element of the intervention inquiry.

4  **II.    In the alternative, Utah should be allowed to intervene permissively.**

5       If the Court does not allow Utah to intervene as a matter or of right, the Court should

6  allow the State to intervene permissively. Federal Rule of Civil Procedure 24(b)(1)(B) provides

7  that, "[o]n timely motion, the court may permit to intervene anyone who has a claim or defense

8  that shares with the main action a common question of law or fact." The decision whether to

9  allow permissive intervention "lies within the discretion of the district court," *Kane Cty., Utah*

10 *v. United States*, 597 F.3d 1129, 1135 (10th Cir. 2010) (internal citation omitted), and "the

11 court must consider whether the intervention will unduly delay or prejudice adjudication of the

12 original parties' rights." Fed. R. Civ. P. 24(b)(3).

13      Utah's claims share common questions of law and fact with the main actions.

14 Furthermore, the motion is timely, and intervention by the State of Utah will neither unduly

15 delay nor prejudice adjudication of the claims in this matter. Accordingly, if the Court does not

16 allow Utah to intervene as a matter of right, it should allow it to intervene permissively, for the

17 reasons set forth above.

18                              **CONCLUSION**

19      For the foregoing reasons, Utah respectfully requests that this Court grant its pending

20 Motion to Intervene.

21

22 Respectfully submitted this 13th day of October, 2020.

23

24                              STATE OF UTAH

25                              */s/ Anthony Rampton*
                                _____
26                              ANTHONY L. RAMPTON
                                KATHY A.F. DAVIS
27                              Assistant Attorneys General for Utah

28